IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:19-CV-19-FL


| | | |
|---|---|---|
| TRAWLER CAROLINA LADY, INC., a North Carolina Corporation | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| WILBUR ROSS, Secretary of Commerce; CHRIS OLIVER, National Oceanic and Atmospheric Administration Assistant Administrator for Fisheries; MICHAEL PENTONY, National Marine Fisheries Service Regional Administrator, Greater Atlantic Regional Fisheries Office; DAVID GOUVEIA, National Marine Fisheries Service Assistant Regional Administrator for Analysis and Program Support, Greater Atlantic Fisheries Office, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |


This matter, raising issues concerning federal management of scallop fishing, is before the court on defendants' motion for summary judgment (DE 49), plaintiff's motion for preliminary injunction (DE 1), plaintiff's motion to strike correspondence beyond the scope of the administrative record (DE 55), and defendants' motion to seal (DE 43). Also before the court is defendants' motion seeking immediate clarification as to whether or not the court will allow evidence to be presented July 19, 2019 (DE 62). For the following reasons, defendants' motions for summary judgment and to seal are granted, plaintiff's motion for preliminary injunction is denied, and the motions to strike and for clarification are denied as moot.

## STATEMENT OF THE CASE

Plaintiff commenced this action January 31, 2019, against defendants Wilbur Ross, Secretary of Commerce, and subordinate government agency officials in the National Marine Fisheries Service ("NMFS") (collectively, hereinafter, "defendants"), seeking judicial review of two separate administrative decisions denying successive applications for scallop fishing permit replacements by plaintiff for the 2018/2019 fishing season, ending March 31, 2019. In its first claim for relief, plaintiff asserts defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, by wrongfully denying plaintiff's applications to transfer a scallop fishing permit from one vessel, the F/V CAPT. JEFF, to another vessel, the F/V MISS TYLER (1), and then to another vessel, F/V MISS TYLER (2).[1] In its second claim for relief, for mandamus under 28 U.S.C. § 1361, plaintiff seeks to compel defendants to approve its applications.

Plaintiff also requests through the vehicle of Rule 65 of the Federal Rules of Civil Procedure an injunction requiring defendants to allow plaintiff to fish its allocated 2018/2019 "Days at Sea," its nearly ten days carried over from the previous scallop season, and its six allocated access trips, "during the 2019/2020 Atlantic Sea Scallop season should it be unable to fish those allocated days and trips during the 2018/2019 Atlantic Sea Scallop season." (Compl. p. 18). After this suit was filed, defendants reconsidered denial of plaintiff's second application, and determined to issue the requested permit for F/V MISS TYLER (2). Defendants filed notice of issuance of permit on February 28, 2019, applying to both the "2018 Fishing Year," expiring March 31, 2019, and the

---

[1] As detailed herein, plaintiff was in possession of two vessels named "F/V MISS TYLER," and, for ease of reference, the court adds either designation (1) or (2) to differentiate them.

"2019 Fishing Year," expiring March 31, 2020. (DE 15-2 at 1-2).[2]  On March 12, 2019, the court entered the following show cause order:

> TEXT ORDER regarding 1 MOTION for Preliminary Injunction. In response to preliminary injunction motion, defendants state that they have provided the preliminary relief requested rendering the motion moot. Defendants have filed documentation thereof and notice of issuance of permits. Plaintiff filed no reply in further support of its motion. Upon review of the motion, memorandum in support, response in opposition, and the record in this matter, unless good cause is shown within seven days hereof why the motion for preliminary injunction should not be denied as moot, without more the clerk of court is directed then to terminate that motion.

Plaintiff responded March 19, 2019, arguing that the case is not moot and the court still has authority to order preliminary injunctive relief in the form of extension of the 2018 fishing season.

The court entered case management order, setting deadlines for filing of the administrative record and dispositive motions, while maintaining setting for bench trial on July 19, 2019. Defendants filed administrative record on April 29, 2019, with two supplements thereafter.[3]  The court granted defendants' motion to limit review to the administrative record and for protective order on May 23, 2019.

In furtherance of the instant motion for summary judgment, defendants rely upon a statement of material facts that cites to documents in the administrative record.  Plaintiff's opposition thereto rests upon an opposing statement of facts, and sworn testimony of plaintiff's counsel and Jonathan Brent Fulcher, plaintiff's president and sole shareholder.  Additionally, plaintiff moves to strike two

---

[2]  Defendants contend that, under applicable regulations, plaintiff would be authorized to use "carryover provisions" for the 2018 season, through the first 60 days of the 2019 fishing year.  According to defendants, the additional relief sought by plaintiff could "be extensively if not wholly redressed without judicial intervention within the context of the applicable carryover regulations" and that other relief sought extending the fishing season is legally unavailable and inequitable to other fishers. (DE 12 at 11).

[3]  In their motion to seal (DE 44), defendants request permanent sealing of an unredacted tax return filed in the administrative record, and to file a redacted version thereof.

documents in the administrative record: 1) a February 2019 memorandum by defendant David Gouveia ("Gouveia"), Assistant Regional Administrator, NMFS, and 2) an April 2019 letter by defendant Michael Pentony ("Pentony"), Regional Administrator, NMFS.

## STATUTORY AND REGULATORY BACKGROUND

To assist with presentation of the facts and claims in this case, the court sets forth below for background purposes a summary of statutes and regulations bearing upon scallop fishing and permitting.

"Pursuant to the Magnuson Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1882, [the "Act"] Congress has delegated to the Commerce Department [and its delegate officials, defendants here] broad authority to manage and conserve coastal fisheries." Kramer v. Mosbacher, 878 F.2d 134, 135 (4th Cir. 1989). "The Act creates independent bodies, Regional Fishery Management Councils, which help the Department carry out specific management and conservation duties." Id. A "Council's principal task is to prepare fishery management plans for its area, which must 'assess and specify the present and probable future condition of, and the maximum sustainable yield' of a fishery." Id. (quoting 16 U.S.C. §§ 1852, 1853). "Council plans are adopted or rejected by the Secretary." Id. (citing 16 U.S.C. § 1854). "If adopted, a plan is put into effect by regulations issued by the Secretary." Id. (citing 16 U.S.C. § 1855).

Under the Act, a fishery management plan must contain provisions "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). A fishery management plan must also "establish a mechanism for specifying annual catch limits in the plan . . . , implementing regulations, or annual

4

specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

Under the Act, "[a]ny fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may . . . require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to . . . any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone . . . [or] the operator of any such vessel. 16 U.S.C. § 1853(b). A fishery management plan may also:

> establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account–
>
> > (A) present participation in the fishery;
> >
> > (B) historical fishing practices in, and dependence on, the fishery;
> >
> > (C) the economics of the fishery;
> >
> > (D) the capability of fishing vessels used in the fishery to engage in other fisheries;
> >
> > (E) the cultural and social framework relevant to the fishery and any affected fishing communities;
> >
> > (F) the fair and equitable distribution of access privileges in the fishery; and
> >
> > (G) any other relevant considerations.

16 U.S.C. § 1853(b)(6) (emphasis added). In turn, "[t]he term 'limited access system' means a system that limits participation in a fishery to those satisfying certain eligibility criteria or requirements contained in a fishery management plan or associated regulation." 16 U.S.C. § 1802(27) (emphasis added).

This case concerns scallop fishing under a fishery management plan, the Atlantic Sea Scallop Fishery Management Plan, developed by the New England Fishery Management Council in consultation with the Mid-Atlantic Fishery Management Council. "The Atlantic Sea Scallop Fishery Management Plan was created in 1982, and since has been amended several times," with amendments implemented through regulations published by the NMFS. Conservation Law Found. v. Evans, 360 F.3d 21, 24 n. 2 (1st Cir. 2004); see 58 Fed. Reg. 46606-01, 46607 (Proposed Rule, Preamble, Sept. 2, 1993).

In 1994, in accordance with the Act and Amendment 4 of the Atlantic Sea Scallop Fishery Management Plan, NMFS memorialized in regulations a "limited access" system, which has continued to be refined through regulations to date, including the following features: (1) requirements for carrying a "limited access scallop permit" on any vessel fishing more than a set amount of scallops per trip; (2) "[a] moratorium on most new entrants into the scallop fishery"; (3) "allocations of days-at-sea (DAS)[4] that vessels may fish for scallops" using a limited access scallop permit; (4) "a prohibition on acquiring more than a 5 percent ownership interest in the total number of limited access scallop vessels"; (5) provisions for "eligibility," "change in ownership," "replacement vessels," and a "consolidation restriction." See 59 Fed. Reg. 2757-01, 2758, 2764 (Final Rule, Jan. 19, 1994) (emphasis added).

The stated rationale behind these measures included considerations that "fishing mortality (i.e. fishing effort) be controlled by placing limits on the number of days that vessels can spend at sea fishing for scallops. Thus the number of vessels that will be allocated DAS must also be

---

[4] A DAS is defined as "each 24-hour period of time during which a fishing vessel is absent from port for purposes of scallop fishing." 59 Fed. Reg. 2757-01, 2763 (Final Rule, Jan. 19, 1994).

controlled to ensure that the DAS limits are not exceeded." 58 Fed. Reg. 46606-01, 46607 (Proposed Rule, Preamble, Sept. 2, 1993).

The court will set forth in further detail below analysis of current regulations pertaining to these limited access system features, as pertinent here.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows. Plaintiff is a North Carolina corporation that owns the fishing vessel F/V CAPT JEFF (official No. 906996). (AR 3390 (DE 37-4 at 9)). On November 20, 2016, the F/V CAPT JEFF struck a rock or rocks in Buzzards Bay, Massachusetts, and nearly sank. (AR 3848 (DE 41-34)). It suffered significant damage, and plaintiff's safety consultant at the time estimated that repairs would take four to six months. (Id.)

From March 2017 to November 2017, a different vessel owned by plaintiff, the F/V MISS TYLER (1),[5] fished for scallops for all the days at sea (DAS) allowed under its scallop fishing permit, which permit is identified as No. 320857, and DAS allocation is identified as MRI 4797.[6] (AR 3325 (DE 36-30 at 2)).

In late 2017, plaintiff sold the F/V MISS TYLER (1), "with the seller retaining the permits" to BHG Scallop LLC, which used the F/V MISS TYLER (1) to fish under a different "DAS (MRI 4441)" designation, from January 2018 to May 2018. (Id.; see also AR 3358 (DE 36-38 at 5)). Also in late 2017, plaintiff transferred F/V MISS TYLER (1)'s "permit and DAS (MRI 4797)" to the F/V

---

[5]     As noted previously, plaintiff has been in possession of two vessels named "F/V MISS TYLER," and for ease of reference the court adds either designation (1) or (2) to differentiate them. The F/V MISS TYLER (1) has official number 651715. The F/V MISS TYLER (2) has official number 522950, and was formerly known as F/V LET IT RIDE.

[6]     A "MRI" number is a "Moratorium Right Identification" number, which "is a unique NMFS-issued number that identifies the unique permit history that qualifies for a specific Atlantic sea scallop permit and its DAS." (AR 3325 (DE 36-30 at 2)).

CAPT JEFF. (Id.). Plaintiff's president and sole shareholder, Jonathan Brent Fulcher, has the same

last name as Gregory Fulcher,[7] one of two members of BHG Scallop, LLC. (AR 3326 (DE 36-30

at 3); Pl's Resp. to Stmt. of Facts ¶ 7).

At some point prior to June 12, 2018, plaintiff acquired back from BHG Scallop, LLC, the

vessel F/V MISS TYLER (1). (See AR 3358 (DE 36-38 at 5)). On June 12, 2018, plaintiff submitted

to NMFS an "application for a vessel permit transfer" from F/V CAPT JEFF to F/V MISS TYLER

(1). (AR 3382, 3389-3391 (DE 37-4)) (hereinafter, the "June 2018 application"). Plaintiff

represented in its June 12, 2018, application that it was the owner of the vessel F/V MISS TYLER

(1) and the F/V CAPT JEFF. (Id.).

Defendant Gouveia, on behalf of NMFS, sent plaintiff a letter on July 16, 2018, denying

plaintiff's June 2018 application (hereinafter, the "July 2018 decision") stating as follows:

---

[7] According to defendants, Jonathan Brent Fulcher and Gregory Fulcher are brothers. (Defs' Stmt. of Facts (DE 50) ¶ 13). Plaintiff does not specifically address this assertion. (See Pl's Stmt. of Facts (DE 56) ¶ 13).

I am responding to your June 12, 2018, replacement application of the F/V *Capt Jeff* with the F/V *Miss Tyler*. Federal regulations specify that a limited access scallop vessel owner may not, "Combine, transfer, or consolidate DAS [days-at-sea] allocations, except as allowed for one-for-one Access Area trip exchanges." Because the F/V *Capt Jeff* has already fished one DAS allocation this year, and based on the information provided, it appears that granting this replacement application would violate this regulation.

When reviewing applications of this nature, we consider the following criteria:

1) The buyer or seller may not derive any financial benefits from the operation of the vessel after it is transferred;
2) the seller may not exercise any control over the activities or operation of the vessel after it is transferred;
3) there are no common shareholders, partners, or investors with significant overlapping ownership interests in the seller or buyer's business operations; and
4) the sale of the vessel is an arm's length transaction and one that meets fair market value.

Based on our review of this application, the relationship between Jonathan Brent Fulcher and Gregory Fulcher, the lack of consideration for the replacement and other factors, we have concluded that this application is not based on an arm length's transaction and would result in the consolidation of DAS from two vessels on to one vessel intended to mutually benefit both parties involved. Therefore, we cannot authorize this replacement.

(AR 3323 (DE 36-29)).

On July 17, 2018, plaintiff responded to defendant Gouveia, asking for the "section of the Code of Federal Regulations where each of the four listed criteria may be found," and asking for identification of "all documents or evidence relied upon" to reach the decision denying the application. (AR 3406 (DE 37-7 at 2)).

On August 3, 2018, Defendant Gouveia, on behalf of NMFS, responded by letter providing a citation to a section of the Code of Federal Regulations, 50 C.F.R. 648.14(i)(2)(iv)(B), and additional explanation of the factual basis for its July 2018 decision. After reviewing the history of ownership and DAS use of F/V CAPT JEFF and F/V MISS TYLER (1), defendant Gouveia explained: "In June 2018, we received the current replacement application, that is requesting to place

a second scallop DAS permit on the F/V MISS TYLER this year, reverse the original ownership of the vessel back to [plaintiff] and to transfer back F/V MISS TYLER's original permit and DAS (MRI 4797)." (AR 3325-3326 (DE 36-30 at 2-3)). "This request for vessel replacement is the same transaction in reverse as last year's by the same owners using the same vessels and permits[,] and requesting the combination of the same DAS on the same vessel for a second year in a row." (AR 3326 (DE 36-30 at 3)). Defendant Gouveia continued:

> This latest chapter in a very convoluted history of numerous replacements of the same vessels and transferring of DAS permits onto these vessels more than once brings into focus, for the first time, an apparent and deliberate pre-arranged agreement between the Fulcher brothers to consolidate DAS from two vessels onto one vessel in the same fishing years for their mutual benefit. Based on this historical pattern of maneuvering of permits and DAS over the last three fishing years, the familial relationship of the principal owners of the vessels involved, the apparent lack of full consideration for these transactions, it appears that these two companies are working together to share this vessel for their mutual financial benefit. Thus, it appears that the requested transactions involving these companies would not truly be 'arm's length,' and, if the scallop DAS are fished, would result in a consolidation of scallop DAS from two vessels onto one vessel in the same fishing year.

(Id.).

Plaintiff appealed the July 2018 decision to defendant Pentony, Regional Administrator for NMFS. (AR 3354 (DE 36-38)). Defendant Pentony, on behalf of NMFS, further reviewed the application and reiterated in letter dated September 5, 2018, the decision to deny the application, including on the basis of a lack of documentation that any payment was made for the sales of F/V MISS TYLER (1) to and from plaintiff and BHG Scallop LLC. (AR 3328 (DE 36-31)).

Later, on November 26, 2018, plaintiff submitted to NMFS a second "application for a vessel permit transfer," (hereinafter, the "November 2018 application"), this time from F/V CAPT JEFF to a different vessel named "MISS TYLER," designated herein as F/V MISS TYLER (2) (official

number 522950).[8] (AR 3336 (DE 36-36)). On December 10, 2018, plaintiff supplemented its

November 2018 application, including with a United States Coast Guard "Bill of Sale" stating that

vessel "LET IT RIDE" (with official number 522950) was sold from "Let It Ride Fishing Corp" to

plaintiff on November 6, 2018. (AR 3409 (DE 37-8) at 2).

Defendant Gouveia, on behalf of NMFS, responded to plaintiff's second application on

December 20, 2018, (hereinafter, the "December 2018 decision"), stating as follows

I am responding to the November 26th replacement application for the F/V *Capt Jeff* and F/V *Miss Tyler*. We cannot allow the consolidation of scallop permits and associated fishing rights of the F/V *Capt Jeff* onto the F/V *Miss Tyler* this fishing year. The prohibition on consolidating scallop permits is found at 50 CFR § 648.4(a)(2)(i)(G), cross-referencing the Northeast multispecies regulation at 50 CFR § 648.4.(a)(1)(i)(G), and states that scallop limited access permits and DAS allocations cannot be combined.

From April to July 2018, the F/V *Let it Ride* fished in the scallop fishery under the ownership of Let it Ride Fishing Corp. Then in August 2018, Let it Ride Fishing Corp submitted a request to replace the F/V *Let it Ride* with the F/V *Temptress*. The F/V *Let it Ride* was then sold on November 6, 2018 to Trawler Carolina Lady, Inc. On November 7, 2018, you asked us if the F/V *Let it Ride* would be allowed to be issued another scallop permit this fishing year. On November 9th, we responded to you that the F/V *Let it Ride* would not be able to be issued another scallop this fishing year because the vessel had already fished DAS scallops this year.

This vessel replacement would result in the consolidation of two limited access scallop permits from two vessels to one vessel in a single fishing year. Therefore, we cannot authorize this replacement. If you have further questions about this matter or if you would like to resubmit this application for the beginning of the 2019 Fishing Year, which begins on April 1, 2019, please contact Ted Hawes at 978-281-9296.

(AR 3331 (DE 36-33)).

---

[8]     As noted previously, plaintiff owned two vessels named "F/V MISS TYLER," and for ease of reference the court adds either designation (1) or (2) to differentiate them. The F/V MISS TYLER (1) has official number 651715. The F/V MISS TYLER (2) has official number 522950, and was formerly known as F/V LET IT RIDE.

On February 14, 2019, plaintiff sent to NMFS a copy of a certified check from plaintiff to "Let It Ride Fishing Corp" for the purchase of F/V LET IT RIDE (since renamed F/V MISS TYLER (2)). (AR 3694 (DE 41-3 at 4)). Eight days later, on February 22, 2019, defendant Gouveia, on behalf of NMFS, reversed decision in a letter stating: "After further consideration of the facts and circumstances of your November 26, 2018 [application]. . . we have decided to reverse our December 20, 2018, denial of the [application]." (AR 3352 (DE 36-37)). Defendant Gouveia, on behalf of NMFS, transmitted to plaintiff on February 27, 2019, a permit for F/V MISS TYLER (2), for the 2018/2019 fishing season (authorizing plaintiff to fish for scallops for the remainder of the 2018 fishing season ending March 31, 2019) and for the 2019/2020 fishing season (authorizing plaintiff to fish for scallops from April 1, 2019, to March 31, 2020). (AR 3332 (DE 36-34); AR 3401, 3403 (DE 37-5, 37-6)).

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).  "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."  Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489–90.

B.     Analysis

1.     Mootness

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983). "[A] federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997).

"[I]f an event occurs while a case is pending . . . that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the [case] must be dismissed." Church of Scientology, 506 U.S. at 12 (quotations omitted). By contrast, "[t]he availability of [a] possible remedy is sufficient to prevent [a] case from being moot." Id. at 13. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). "Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." Id.

In addition, courts "have recognized an exception to the general rule [of mootness] in cases that are capable of repetition, yet evading review," which occurs where "two elements combine[]: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or

expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." Murphy v. Hunt, 455 U.S. 478, 482 (1982) (quotations omitted). For this exception to apply, "there must be a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." Id.

Notwithstanding defendants' protestations that all of plaintiff's claims are mooted by defendants' reconsideration of the December 2018 decision and issuance of permit to plaintiff for use by the F/V MISS TYLER (2) for the 2018/2019 fishing season and 2019/2020 fishing season, this case as a whole is not moot. Rather, only certain claims and types of relief sought by plaintiff are moot.

Plaintiff's claim for mandamus relief, under 28 U.S.C. § 1361, seeks to compel defendant Gouveia "to approve the Plaintiff's Replacement Vessel Application and to transfer Northeast Federal Fishing Permit 330626 from the F/V CAPT. JEFF to the F/V MISS TYLER, Official Number 522950 for the 2018/2019 sea scallop season." (Compl. ¶ 66). Plaintiff also seeks the same relief in its motion for preliminary injunction. (Id. at pp. 16-17). Defendants awarded exactly this relief sought during pendency of the action on February 27, 2019. (AR 3332 (DE 36-34); AR 3403 (DE 37-6)). Therefore, plaintiff's claim for mandamus relief under 28 U.S.C. § 1361, and in this part plaintiff's preliminary injunction motion, must be denied as moot.

Plaintiff's claim under the APA and request for prospective relief, by contrast, present a live controversy unlike the mandamus claim or related request for injunctive relief. In its APA claim, plaintiff seeks a declaration that defendants' actions "in denying the Plaintiff's replacement vessel applications to replace the F/V CAPT. JEFF were arbitrary, capricious, an abuse of discretion and not in accordance with law, were in excess of statutory authority or limitations and unwarranted by

the facts." (Compl. ¶ 55). This claim is not mooted in whole as they argue, by defendants' reconsideration of the December 2018 decision because plaintiff allegedly "suffered . . . a legal wrong" on account of the July 2018 decision, and defendants did not reconsider or grant the July 2018 decision in any part. (Id. ¶ 53). The fact that defendants ultimately reconsidered the December 2018 decision does not moot a clam for relief premised upon denial of the June 2018 application. It is less clear whether the claim based upon the December 2018 decision is or is not moot. Out of an abundance of caution, the court considers the merits of the claim, where the limited duration of the scallop fishing season precluded review prior to its expiration. See, e.g., Kramer, 878 F.2d at 136 (finding claims not moot where "both the yearly reevaluation of catch limits and closure orders present circumstances which are too short to be fully litigated prior to their cessation or expiration.").

In sum, plaintiff's claims for mandamus and injunctive relief are denied as moot. Plaintiff's remaining claims are addressed in turn below.

2.     APA Claim

Plaintiff contends that defendants' July 2018 and December 2018 decisions were arbitrary and capricious, in excess of authority, and unwarranted by the facts, in violation of the APA. The court first sets forth below standards for evaluating an APA claim under the circumstances presented. Then the court applies these standards in turn to defendants' challenged decisions.

a.     APA Standards

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). Under the APA, as pertinent here, the court must "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

The court's "determination naturally begins with a delineation of the scope of the Secretary's authority and discretion." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971). Then, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 416. Under "this 'narrow' standard of review, we insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" Fox Television Stations, 556 U.S. at 513 (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983)). The United States Supreme Court has "made clear, however, that a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. at 513-514 (quotations omitted).

Pursuant to the APA, "[i]n making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. As discussed in the court's prior order, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973). According to "fundamental principles of judicial review of agency action . . . [t]he task of the reviewing court is to apply the appropriate APA standard of review, to the agency decision based on the record the agency presents to the reviewing court." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).

"[W]hole record . . . review is to be based on the full administrative record that was before the [decisionmaker] at the time he made his decision." <u>Overton Park</u>, 401 U.S. at 420. "The whole administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers." <u>In re United States</u>, 138 S.Ct. 371, 372 (2017) (quotations omitted). "[C]onsideration of . . . post hoc documents in deciding [an] administrative appeal is inappropriate." <u>Trinity Am. Corp. v. U.S. E.P.A.</u>, 150 F.3d 389, 401 n. 4 (4th Cir. 1998).

b.     July 2018 Decision

Plaintiff's APA claim based upon the July 2018 decision is without merit because the decision was made within the scope of defendants' authority, explained sufficiently, and based upon consideration of relevant factors, for the reasons set forth below.

i.     Authority

As an initial matter, defendants were acting within the scope of their authority in evaluating and denying plaintiff's June 2018 application. As set forth in the statutory and regulatory background, above, the Act grants defendants "broad authority to manage and conserve coastal fisheries," and to adopt regulations for that purpose. <u>Kramer</u>, 878 F.2d at 135 (citing16 U.S.C. § 1855). The Act provides authority for "implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, <u>including measures to ensure accountability</u>" and requirements for permits. 16 U.S.C. § 1853(a)(15) & (b) (emphasis added). The Act authorizes establishment of "a limited access system" "that limits participation in a fishery to <u>those satisfying certain eligibility criteria or requirements contained in a fishery management plan or associated regulation</u>," 16 U.S.C. § 1802(27) (emphasis added), developed by taking into account a broad range of considerations, including "historical fishing practices in, and dependence on, the fishery; the fair

and equitable distribution of access privileges in the fishery; and . . . any other relevant considerations." 16 U.S.C. § 1853(b)(6) (emphasis added).

Implementing regulations, in turn, provide authority to defendants to scrutinize and manage vessel ownership, permitting, replacements, and other changes. "Any vessel of the United States that fishes for, possesses, or lands Atlantic sea scallops . . . must have been issued and carry on board a valid scallop vessel permit pursuant to this section." 50 C.F.R. § 648.4(a)(2) (emphasis added). The regulations set forth eligibility criteria, as well as restrictions and limitations on application methods, qualification, change in ownership, percentage ownership restrictions, replacement vessels, consolidation of limited access permits and DAS allocations. See 50 C.F.R. § 648.4(a)(2)(i). The regulations also set forth procedural requirements for processing permit applications:

> Applicants for a permit under this section must submit a completed application on an appropriate form obtained from the Regional Administrator. The application must be signed and submitted to the Regional Administrator at least 30 days before the date on which the applicant desires to have the permit made effective. The Regional Administrator will notify the applicant of any deficiency in the application pursuant to this section. Vessel owners who are eligible to apply for limited access or moratorium permits under this part shall provide information with the application sufficient for the Regional Administrator to determine whether the vessel meets the applicable eligibility requirements specified in this section.

50 C.F.R. § 648.4(c)(1) (emphasis added). In sum, the challenged July 2018 decision was well within the authority of defendants to make.

ii.     Explanation

Defendants, through defendant Gouveia, also sufficiently explained their July 2018 decision, first, in an initial July 16, 2018, letter in response to the replacement application, (AR 3323 (DE 36-29)), and then in a detailed August 3, 2018, letter in response to questions by plaintiff. (AR 3325 (DE 36-30). In addition, defendants, through defendant Pentony, further explained the decision in

a September 5, 2018, letter denying plaintiff's further request for reconsideration, after receipt of substantial documentary submissions by plaintiff.  (AR 3328 (DE 36-31).

iii.     Relevant Factors

The next and most disputed issue here is whether defendants considered and examined "relevant factors" and "relevant data" in reaching the July 2018 decision.  Overton Park, 401 U.S. at 416; Fox Television Stations, 556 U.S. at 513.  In the July 2018, letter explaining the decision, one factor defendant Gouveia identifies is "that a limited access scallop vessel owner may not [c]ombine, transfer, or consolidate DAS [days-at-sea] allocations."  (AR 3323 (DE 36-29)).  This factor is relevant for consideration and examination by defendants because it is one of the prohibitions and restrictions in the limited access permit regulations.  Indeed it is stated twice: first as a general restriction on limited access permits, and second as a specific prohibition directed at a vessel owner.  See 50 C.F.R. § 648.4(a)(1)(i)(G) & (2)(i)(G) ("Consolidation restriction. . . . limited access permits and DAS allocations may not be combined or consolidated. . . ."); 50 C.F.R. § 648.14(i)(2) ("It is unlawful for any person owning or operating a vessel issued a limited access scallop permit . . . to do any of the following: . . . Combine, transfer, or consolidate DAS allocations. . . .").

Another factor defendant Gouveia identifies in the July 2018 letter is "that this application is not based on an arm length's [sic] transaction and would result in the consolidation of DAS from two vessels on to one vessel intended to mutually benefit both parties involved." (AR 3323 (DE 36-29)).  Related to ownership, Gouveia states that defendants considered the following criteria and facts:

> 1) the buyer or seller may not derive any financial benefits from the operation of the vessel after it is transferred;

20

2) the seller may not exercise any control over the activities of the vessel after it is transferred;

3) there are no common shareholders, partners, or investors with significant overlapping ownership interests in the seller or buyer's business operations; and

4) the sale of the vessel is an arm's length transaction and one that meets fair market value.

(Id.). In addition, defendant Gouveia states that defendants considered "the relationship between Jonathan Brent Fulcher and Gregory Fulcher, the lack of consideration for the replacement and other factors" related to ownership. (Id.). Discussion of these factors continues in defendant Gouveia's August 2018 letter and defendant Pentony's September 2018 letter. (AR 3325 (DE 36-30); AR 3328 (DE 36-31)).

The factors of ownership, identity, and arm's-length transaction are relevant to defendants' decision because of the importance the regulations place on these factors for issuance of permits, in particular, and management of the scallop fishery, in general. For example, determination of ownership is a key component of a permit application, which "must contain at least the following information, and any other information required by the Regional Administrator":

> if the owner is a corporation, a copy of the current Certificate of Incorporation or other corporate papers showing the date of incorporation and the names of the current officers of the corporation, and the names and addresses of all persons holding any ownership interest in a NE multispecies permit or CPH or shareholders owning 25 percent or more of the corporation's shares for other fishery permits; if the owner is a partnership, a copy of the current Partnership Agreement and the names and addresses of all partners.

50 C.F.R. § 648.4(c)(2)(i) (emphasis added). In addition, both the regulations and the Act define ownership and identity of a "person" comprehensively and broadly:

> Ownership interest, in the NE multispecies fishery, includes, but is not limited to holding share(s) or stock in any corporation, any partnership interest, or membership in a limited liability company, or personal ownership, in whole or in part, of a vessel issued a limited access NE multispecies permit or confirmation of permit history

(CPH), including any ownership interest in any entity or its subsidiaries or partners, <u>no matter how far removed</u>.

50 C.F.R. § 648.2 (emphasis added). Further, the regulations state for determining "[p]ercentage ownership restrictions":

> Having an ownership interest includes, but is not limited to, persons who are shareholders in a vessel owned by a corporation, who are partners (general or limited) to a vessel owner, <u>or who, in any way, partly own a vessel</u>.

50 C.F.R. § 648.4(a)(2)(i)(M) (emphasis added). Under the Act:

> The term "person" means any individual (whether or not a citizen or national of the United States), any corporation, partnership, association, <u>or other entity (whether or not organized or existing under the laws of any State)</u>, and any Federal, State, local, or foreign government or any entity of any such government.

16 U.S.C. § 1802(36).

In addition, with respect to management of the fishery in general, defining and determining vessel ownership is a prominent feature in explaining the basis for the present limited access scallop permit system first embodied in the 1994 regulations and carried forward to the regulations in their present form:

> Two individuals commented that vessel owners <u>should be allowed to combine limited access scallop permits and DAS allocations on [sic] one vessel</u> and <u>that ownership interest should not be limited</u> to 5 percent of the total number of scallop vessels qualifying under the moratorium.

> Response: National Standard 5, 16 U.S.C. 1851(a)(5), states that conservation and management measures, where practicable, should promote efficiency. This standard also provides, however, that <u>the goals of efficiency may be balanced against other factors such as social and biologic</u>. In its deliberations, <u>the Council explicitly considered possible gains in efficiency in allowing DAS to be combined, but ultimately rejected such a measure because of socioeconomic concerns of preserving current fishing practices and traditions at the outset of the management program</u>. The Council was concerned that <u>allowing combination or transfer of DAS allocations, at this time, may precipitously lead to aggregation of fishing rights in the hands of a few</u>, thereby challenging <u>the current type of fishing operations</u> associated with the northeast region. Moreover, it would be impracticable to allow such fishing rights

to be transferred, at this time, before <u>the effectiveness of the management measures</u> could be assessed. The Council did provide, however, that measures that may enhance efficiency can be considered and adopted through the framework procedure specified in the rule. NMFS concurs in the Council's deliberations and conclusions concerning these measures.

59 Fed. Reg. 2757-01, 2760 (Final Rule, Jan. 19, 1994) (emphasis added).

In addition, concepts of corporate ownership, identity, and arm's-length transactions are interrelated with permit transfer restrictions, as illustrated in an example provided in the regulations. Indeed, the regulations, in the separate context of "multispecies vessels" and permit ownership, states that "[t]he transfer of a permit . . . rendered unusable shall be made through <u>an arm's-length transaction</u> (<u>for example, to an independent and unrelated entity that does not share an ownership interest with that person</u>)." 50 C.F.R. § 648.4(a)(1)(i)(N) (emphasis added). This statement of an example of an "arm's-length transaction" illustrates the importance of considering ownership and identity generally in evaluating permit transfers.

These factors also are consistent with the common law concepts of corporate ownership, identity, and arm's-length transactions. <u>See, e.g.</u>, <u>Sky Cable, LLC v. DIRECTV, Inc.</u>, 886 F.3d 375, 386–87 (4th Cir. 2018) (noting availability to "pierce a company's veil <u>if separate entities operate as a single economic entity</u> such that it would be inequitable . . . to uphold a legal distinction between them.") (quotations omitted) (emphasis added); <u>DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.</u>, 540 F.2d 681, 683 (4th Cir. 1976) ("[I]n an appropriate case and in furtherance of the ends of justice, the corporate veil will be pierced and the corporation and its stockholders <u>will be treated as identical</u>.") (emphasis added); <u>Inland Terminals, Inc. v. United States</u>, 477 F.2d 836, 840 n. 4 (quotations omitted) (4th Cir. 1973) ("[T]he business of one corporation may be regarded

as <u>including the business of another corporation</u> if such other corporation is a <u>mere instrumentality</u> of the first corporation.") (emphasis added).

In sum, defendants considered relevant factors in reaching the July 2018 decision. In so holding, the court emphasizes that it is not making its own independent determination that such factors require the result reached by defendants to deny the June 2018 application. Rather, the court's holding is much more limited, under the requisite "narrow standard of review," to ensure defendants reviewed the "relevant data," where the court does not "substitute [the court's] judgment for that of the agency." <u>Fox Television Stations</u>, 556 U.S. at 513.

Plaintiff argues that the regulations plainly allow for transferring a vessel from one permit holder to another permit holder, without implicating the restrictions on consolidation of DAS by one owner or other ownership factors. In support of this interpretation of the regulations, plaintiff quotes from a 1994 memorandum by counsel for NMFS, Gene S. Martin, Jr. ("Martin"), interpreting the prohibition on DAS. (Pl's Resp. (DE 55) at 25 (quoting AR 3691 (DE 37-35 at 3) (hereinafter, the "1994 memorandum")). In particular, plaintiff notes Martin states that the prohibition at § 50 C.F.R. § 648.14(i)(2) "adds clarification" to the more general restriction at § 648.4(a)(1)(i)(G). (<u>Id.</u>). Plaintiff notes Martin reasons as follows, quoting the language in § 648.14:

> [I]t is unlawful for <u>any person</u> owning or operating a vessel issued a limited access scallop permit…to…[c]ombine, transfer, or consolidate DAS allocations. . . .
>
> *In light of this language, the restriction on consolidating DAS applies only when one person consolidates or attempts to consolidates DAS.* Therefore, if <u>one person</u> consolidates or combines DAS onto one vessel from two or more vessels, by replacing vessels or through other means, in the same fishing year, that person would be violating the prohibition on such transactions.
>
> *But this prohibition does not prohibit a vessel from fishing under two DAS allocations in one fishing year if the vessel, after using some or all of its DAS allocation under one permit holder, is then transferred to another permit holder* to

> replace a vessel that has its own DAS allocation because <u>one person</u> would not be consolidating the DAS.

(Pl's Resp. (DE 55) at 25 (quoting AR 3691 (DE 37-35 at 3) (underlining in original, italics added here)). Plaintiff suggests that the court's inquiry should begin and end with the italicized language, because plaintiff, as one person, did not fish under two allocations in one year, but only the vessel MISS TYLER (1), under ownership of two different persons, fished two allocations. (<u>See</u> <u>id.</u>).

Neither the 1994 memorandum nor the regulations, however, support the bright-line interpretation advanced by plaintiff. Rather, the memorandum continues by stating that the key factor in making the determination of whether "<u>one person</u>" is consolidating DAS is the identity of the permit holders, and whether the permit holders share an identity in fact. (AR 3691 (DE 37-35 at 3)). The memorandum goes on to identify multiple factors bearing upon the identity of a permit holder and ownership of vessels using DAS allocations, including all of the factors identified by defendants in the July 2018 decision. (<u>Id.</u> at 3-5; <u>see</u> AR 3323 (DE 36-29)).

Plaintiff suggests that the court should not defer to defendants' interpretation of the regulations, either as articulated in the 1994 memorandum or in the July 2018 decision. However, the United States Supreme Court recently reiterated that "we presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules," under the doctrine referred to as "<u>Auer</u> deference." <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2414 (2019) (citing <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997)). By contrast, "[i]f uncertainty does not exist, there is no plausible reason for deference." <u>Id.</u> at 2415. "The regulation then just means what it means—and the court must give it effect, as the court would any law." <u>Id.</u> In such a case, "courts should not give deference to an agency's reading, except to the extent it has the 'power to persuade,'" a lesser deferential standard in accordance <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944). <u>Id.</u>

Plaintiff's argument challenging defendants' interpretation of the regulations is unavailing for several reasons. First, the court need not apply <u>Auer</u> deference to uphold defendants' July 2018 decision under the circumstances of this case. The permit regulations give defendants broad authority to scrutinize applications, "notify the applicant of any deficiency in the application," and "to determine whether the vessel meets the applicable eligibility requirements specified in this section." 50 C.F.R. § 648.4(c)(1). In turn, the regulations carry the "consolidation restriction" that "DAS allocations may not be combined or consolidated. . . ." 50 C.F.R. § 648.4(a)(1)(i)(G) & (2)(i)(G); and that "any person owning or operating a vessel" cannot "Combine, transfer, or consolidate DAS allocations. . . ." 50 C.F.R. § 648.14(i)(2). These restrictions unambiguously give defendants authority to decline to authorize a transfer application on the ground that it would involve a consolidation of DAS allocations, as defendants stated here. (AR 3323 (DE 36-29)).

Second, additional provisions in the regulations cited by plaintiff do not unambiguously require a different result, as plaintiff contends, but rather, at most, create a "genuine ambiguity." <u>Kisor</u>, 139 S. Ct. at 2415. For instance, the regulations provide that "[a]n owner of a vessel that has been issued any limited access or moratorium permit under this section is limited to one vessel replacement permit year" and "[t]he fishing and permit history of a vessel is presumed to transfer with the vessel whenever it is bought, sold, or otherwise transferred." 50 C.F.R. § 648.4(a)(1)(i)(D) & (E). But these regulations do not address or cross-reference the prohibitions on consolidating DAS, under 50 C.F.R. § 648.4(a)(1)(i)(G) & (2)(i)(G); 50 C.F.R. § 648.14(i)(2).

Third, plaintiff does not demonstrate how the pertinent regulations unambiguously foreclose defendants' interpretation or favor plaintiff's interpretation. Plaintiff suggests that the court should avoid any inquiry into the definition of "<u>any person</u> owning or operating a vessel" in the regulation,

50 C.F.R. § 648.14(i)(2) (emphasis added).  The text, informed by its statutory and regulatory context, does not support a limited definition of "any person owning or operating a vessel." <u>Id.</u> Rather, read in conjunction with the definitions set forth above, and the stated purposes of the limited access system, the text supports a broad definition of person and ownership that takes into consideration overlap in ownership and operation of vessels, inviting consideration of corporate formalities and the nature of an "arm's-length" transaction. <u>See</u> 50 C.F.R. § 648.4(c)(2)(i); 50 C.F.R. § 648.2; 50 C.F.R. § 648.4(a)(2)(i)(M) & (N); 16 U.S.C. § 1802(36); 59 Fed. Reg. 2757-01, 2760 (Final Rule, Jan. 19, 1994).

Plaintiff also argues that the court should not defer to defendants' current interpretation of the permit regulations because it conflicts with defendants' "prior interpretation of the regulatons." (Pl's Resp. (DE 55) at 27).  The July 2018 decision, however, mirrors the interpretation set forth in the 1994 memorandum.  (<u>Compare</u> AR 3691 (DE 37-35 at 3-5) <u>with</u> AR 3323 (DE 36-29)).  Indeed, consistent with its July 2018 decision, the 1994 memorandum states that "[f]actors NMFS will look at . . . include, but are not limited to, whether the transfer appears to be an 'arm's length' transaction, whether the transferor/seller derive any financial benefits from the operation of the vessel after it is transferred, whether the seller/transferor exercises any control over the activities or operation of the vessel after it is transferred, and whether there are any common shareholders, partners or investors. . . ."  (AR 3691 (DE 37-35 at 3-5); <u>see</u> AR 3323 (DE 36-29)).  Thus, defendants have not changed their interpretation from that originally stated in 1994.

Plaintiff appears to contend that defendants have not been enforcing the regulations consistently over the years, and there have been instances where vessel transfer applications have been approved without scrutiny of the factors articulated in the 1994 memorandum and the July

2018 decision.[9]  But, an agency's change of enforcement practices and exercise of enforcement

discretion is treated differently from an agency's change in interpretation of the law.  On the one

hand, for example, an agency "should not change <u>an interpretation in an adjudicative proceeding</u>

where doing so would impose new liability on individuals for past actions which were taken in

good-faith reliance on agency pronouncements or in a case involving fines or damages."

<u>Christopher v. SmithKline Beecham Corp.</u>, 567 U.S. 142, 157 (2012) (quotations omitted, emphasis

added).  On the other hand,  "an agency's <u>enforcement decisions</u> are informed by a host of factors,

some bearing no relation to the agency's views regarding whether a violation has occurred."  <u>Id.</u>

(emphasis added). "[A]n agency decision not to enforce often involves a complicated balancing of

a number of factors which are peculiarly within its expertise," and is thus committed to the agency's

discretion.  <u>Heckler v. Chaney</u>, 470 U.S. 821, 831 (1985); <u>see</u> <u>De Osorio v. U.S. I.N.S.</u>, 10 F.3d

1034, 1042 (4th Cir. 1993) ("[U]npublished precedent [of past agency decisions] is a dubious basis

for demonstrating the type of inconsistency which would warrant rejection of deference.").

This case falls in the latter category.  Indeed, defendant Gouveia, on behalf of NMFS,

highlighted that plaintiff had been granted several prior vessel replacement applications as a factor

in the exercise of enforcement discretion in further explaining decision on the June 2018 application

in the August 3, 2018, letter.  Such prior granted applications do not preclude enforcement of the

---

[9]  Plaintiff argues that the "[a]dministrative record[] is incomplete" and that it cannot adequately respond to summary judgment because, outside of the administrative record, plaintiff has identified 13 "different vessel transactions involving the replacement of a scallop vessel by another scallop vessel that had already fished its DAS allocation," as well as a transcript of statements by an NMFS employee stating that there has been a change in interpretation of the vessel replacement regulations.  (Pl's Resp. (DE 55) at 8).  Nevertheless, "whole record . . . review is to be based on the full administrative record that was before the [decisionmaker] at the time he made his decision."  <u>Overton Park</u>, 401 U.S. at 420. Moreover, for the reasons explained above in the text, the fact that defendants may have allowed replacement applications in the past does not preclude it from exercising its enforcement discretion under the circumstances presented by plaintiff's June 2018 application. Along these lines, statements by the NMFS employee, which are consistent with the 1994 memorandum, do not reflect a change in interpretation but rather a change in enforcement approach. (<u>See</u> DE 55-2 at 19-21).

regulations in this instance; to the contrary, as explained in the August 3, 2018, letter, they serve as a basis, in themselves, for denying the June 2018 application. (See, e.g., AR 3326 (DE 36-30 at 3) (noting "numerous replacements of the same vessels and transferring of DAS permits onto these vessels more than once brings into focus, for the first time, an apparent and deliberate pre-arranged agreement" and a "historical pattern of maneuvering of permits")). In sum, any change in enforcement approach in the July 2018 decision was based upon a consideration of multiple factors and explained in defendants' decision. Therefore, a change of enforcement approach in this manner does not provide a basis for setting aside the July 2018 decision as plaintiff contends.

Where the decision was within defendants' authority, adequately explained, and based upon consideration of relevant factors, plaintiff's APA claim based upon the July 2018 decision must be denied.

c.      December 2018 Decision

Plaintiff's APA claim based upon the December 2018 decision also is without merit. Many of the same considerations set forth above with respect to defendants' July 2018 decision also apply to defendants' December 2018 decision. In particular, the court's determination that the action was properly within defendants' authority applies equally to defendants' December 2018 decision, and the court incorporates here its prior analysis (at section B.2.b.i., above) of statutory and regulatory authority.

The court addresses separately the sufficiency of the explanation in the December 2018 decision letter.[10] Defendant Gouveia explained, on behalf of NMFS: "This vessel replacement

_____

[10]   Plaintiff has moved to strike a February 20, 2019, internal NMFS memorandum entitled "Clarification of Criteria Used to Approve Applications to Replace Scallop Vessels . . . ." (AR 3415 (DE 37-10)) and an April 15, 2019, letter from NMFS to the New England Fishery Management Council, (AR 3687, DE 37-24), both of which include discussion of the reasons for the December 2018 decision. (DE 55). Plaintiff moves to strike these documents on the

would result in the consolidation of two limited access scallop permits from two vessels on to one vessel in a single fishing year. Therefore, we cannot authorize this replacement." (AR 3331 (DE 36-33)). Defendant Gouveia also references the "prohibition on consolidating scallop permits . . . found at 50 CFR § 648.4(a)(2)(i)(G) . . . stat[ing] that scallop limited access permits and DAS allocations cannot be combined." (Id.).

Defendants Gouveia and Pentony, on behalf of NMFS, included this same reason in their letters explaining the denial of plaintiff's June 2018 application. (See AR 3323 (DE 36-29) (stating application "would result in the consolidation of DAS from two vessels on to one vessel intended to mutually benefit both parties involved"); AR 3326 (DE 36-30 at 3) (stating application "would result in a consolidation of scallop DAS from two vessels onto one vessel in the same fishing year"); AR 3329 (DE 36-31 at 2) ("The prohibition on consolidating scallop permits, which was not specifically referred to in our earlier letter, is found at 50 CFR § 648.4(a)(2)(i)(G) . . . and states that scallop limited access permits and DAS allocations cannot be combined.").

In the December 2018 decision letter, defendant Gouveia does not provide a discussion of factors related to ownership, identity, and arm's-length transaction, as defendants Gouveia and Pentony do in the July 2018 decision and related explanation letters. Nonetheless, "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (citation omitted). Under the circumstances of this case, in light of the extensive discussion thereof in the

basis that they are post hoc rationalizations not proper for consideration on review of the December 2018 decision. The court does not consider these documents in review of the December 2018 decision. However, they do provide background context for defendants' reconsideration of the December 2018 decision and they are relevant to the issue of mootness. Accordingly, plaintiff's motion to strike is DENIED AS MOOT.

July 2018 decision and related explanation letters, to the same applicant, based upon the same regulatory prohibition, it is reasonable to infer that defendants considered those same factors in the December 2018 decision.

Moreover, the available remedy for a lack of sufficient explanation – a remand to the agency for further explanation, see Overton Park, 401 U.S. at 420 – would serve no purpose because defendant Gouveia, on behalf of NMFS, already further explained defendants' decision in the February 22, 2019 reconsideration letter, including consideration of the "arm's length transaction" factor. (AR 3352 (DE 36-37)); see 5 U.S.C. § 706 (in undertaking review of an administrative decision, "due account shall be taken of the rule of prejudicial error").

In sum, defendants sufficiently explained the December 2018 decision through reference to the prohibition on consolidating DAS allocations under 50 C.F.R. § 648(a)(2)(i)(G). The factors included in considering this prohibition, ownership, identity, and arm's-length transaction, are relevant factors for consideration by defendants in making the decision, for the reasons stated by the court in its above (subsection B.2.b.iii.) analysis of relevant factors for the July 2018 decision.

In addition to challenging defendants' interpretation of their own regulations and criteria employed, addressed by the court above with respect to the July 2018 decision, plaintiff suggests that the bill of sale it provided with its November 2018, application, was sufficient to meet the criteria for an arm's-length transaction. However, plaintiff submitted a bill of sale with both the June 2018 application and November 2018 application, and neither provided sufficient indicia in itself of an arm's-length transaction, because the amount of consideration was not specified. (See AR 3385 (DE 37-4); AR 3410 (DE 37-8)). Accordingly, it was not unreasonable for defendants to require further documentation confirming the sale, which plaintiff ultimately provided for the

November 2018 application but did not provide sufficiently for the June 2018 application. (See AR 3694 (DE 41-3); AR 3329 (DE 36-31 at 2)).

Thus, where the decision was within defendants' authority, adequately explained, and based upon consideration of relevant factors, plaintiff's APA claim based upon the December 2018 decision also must be denied.

3.    Preliminary and Permanent Injunction

Because the court has determined that all of plaintiff's claims either must be dismissed as moot or denied on the merits, plaintiff's request for injunctive relief in the form of an extension of the fishing season must be denied. Where plaintiff fails on the merits of its claims, preliminary and permanent injunctive relief is not available. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008);  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

In addition, without finding an unlawful agency action, the court lacks jurisdiction to award in the abstract to plaintiff equitable relief.  See 5 U.S.C. § 702.  Moreover, the court lacks jurisdiction to award the relief sought by plaintiff in the form of a modification of plaintiff's permits to allow an extension of the fishing season or DAS allocations, where plaintiff has not sought such relief in the first instance from NMFS. See id.; see, e.g., Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 333-34 (1976) ("The Court, it is true, has power 'to affirm, modify, or set aside' the order of the Commission 'in whole or in part.' But that authority is not power to exercise an essentially administrative function.").

Accordingly, plaintiff's motion for preliminary injunction and request for permanent injunctive relief is denied.

4.    Motion to Seal

Defendants seek to seal an unredacted tax form in the administrative record for BHG Scallop, LLC (DE 37-15), containing personal identifying information, and to file on the public record a redacted version thereof. Where the document for which filing under seal is requested contains personal identifying information, for which redaction is required pursuant to 5 U.S.C. § 552a, overcoming common law and First Amendment presumption to access, and where no objection to the motion has been filed, the court finds good cause for sealing and filing a redacted version. See Stone v. University of Maryland Medical System Corp., 855 F.2d 178, 180-81 (4th Cir. 1988).

Accordingly, the motion to seal is granted and the clerk is directed to file separately the proposed redacted document lodged by defendants at DE 44.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 49) is GRANTED, plaintiff's motion for preliminary injunction (DE 1) is DENIED, and the motion to strike (DE 55) is DENIED as MOOT. Defendants' motion to seal (DE 43) is GRANTED and the clerk is DIRECTED to file the proposed redacted document lodged by defendants at DE 44. Where there are no remaining issues for decision, defendants' motion for clarification as to whether or not the court will allow evidence to be presented July 19, 2019 (DE 62), is DENIED as MOOT. Each party shall bear its own costs. The clerk is DIRECTED to close this case.

SO ORDERED, this the 16th day of July, 2019.


LOUISE W. FLANAGAN
United States District Judge